UNITED STATES of America, (By the Office of Independent Counsel), Plaintiff–Appellant,

v.

Joseph F. FERNANDEZ, Defendant–Appellee.

No. 89–5819.

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1990.

Decided Sept. 6, 1990.

Gerard Edmund Lynch, Office of Independent Counsel, argued, Lawrence Walsh, Laurence Shtasel, Geoffrey S. Berman, Office of Independent Counsel, Washington, D.C., on brief, for plaintiff-appellant.

Thomas Edward Wilson, argued, Mary Beth Sullivan, Seyfarth, Shaw, Fairweather & Geraldson, on brief, Washington, D.C., for defendant-appellee.

Before CHAPMAN, WILKINSON and WILKINS, Circuit Judges.

WILKINSON, Circuit Judge:

Independent Counsel, who is prosecuting this case for the United States pursuant to the Ethics in Government Act, 28 U.S.C. § 594(a), appeals under § 7(a) of the Classified Information Procedures Act (CIPA), 18 U.S.C.App. § 7(a), from the district court's dismissal of the indictment against defendant Joseph Fernandez. The district court dismissed the case with prejudice after the Attorney General of the United States filed an affidavit under § 6(e)(1) of CIPA prohibiting the disclosure of classified evidence

that the district court had previously ruled to be relevant and admissible.

On appeal, the government contends that the district court abused its discretion in ruling certain classified evidence to be admissible, in rejecting the government's proposals for substituted versions of the evidence, and in dismissing the case with prejudice after the Attorney General prohibited disclosure of the evidence. After thoroughly reviewing the record, we cannot say that any of the district court rulings constitute an abuse of discretion. We thus affirm its judgment.[1]

### I.

On November 25, 1986, the Attorney General of the United States announced that proceeds from arms transfers from the United States to Iran may have been diverted to assist the Nicaraguan resistance forces known as the Contras. This disclosure led to two investigations pertinent to this case: In late November 1986, the CIA's Office of Inspector General began an investigation into the CIA's military and paramilitary support of the Contras; and on December 1, 1986, the President of the United States established a Special Review Board, known as the Tower Commission, to examine the proper role of the National Security Council and the circumstances surrounding the Iran–Contra affair.

In January and February 1987, the two investigative bodies interviewed appellee Joseph Fernandez concerning his activities as the CIA's Chief of Station in San Jose, Costa Rica, from 1984–1986, a time during which the Boland Amendment prohibited CIA officers from supporting military and paramilitary operations by the Contras. The investigators questioned Fernandez about, *inter alia*, (1) his activities relating to the construction of an airstrip in northwestern Costa Rica in 1985, (2) his role in a 1986 operation by so-called "private benefactors" to resupply the Contras from the airstrip, and (3) his relationship with several individuals involved in the resupply operation—including Colonel Oliver North, then

a member of the National Security Council staff, and Rafael Quintero, one of North's representatives in Central America. The investigators never questioned Fernandez under oath, and they failed to record or to transcribe any of his answers.

On April 24, 1989, Fernandez was indicted on two counts of making false official statements to the two investigative bodies in violation of 18 U.S.C. § 1001, and on two counts of obstructing the investigators' proceedings in violation of 18 U.S.C. § 1505. The indictment was obtained by an Independent Counsel appointed pursuant to the Ethics in Government Act, 28 U.S.C.A. §§ 591 *et seq.* That Act transfers from the Department of Justice to Independent Counsel all prosecutorial and investigative authority in cases that come within Independent Counsel's jurisdiction. *See Appeal of the United States by the Attorney General,* 887 F.2d 465, 468 (4th Cir. 1989). Thus, this case is being prosecuted by Independent Counsel rather than the Attorney General of the United States. Nonetheless, the Attorney General retains responsibility under CIPA for protection of national security secrets. *Id.* at 471. Accordingly, his office has worked closely with Independent Counsel "to ensure that national security secrets are safeguarded," and has "participated in framing both the initial charges and the substitution proposals." *Id.* at 467.

Counts One and Two of the indictment charge Fernandez with misrepresentations to the Inspector General of the CIA about the genesis and purpose of the Costa Rican airstrip project. The indictment states that the airstrip project was initiated by Fernandez and was designed to assist in the resupply of the Contras. It also states that Fernandez had numerous contacts with Rafael Quintero concerning the construction of the airstrip. It alleges that Fernandez lied and obstructed proceedings when he stated that the airstrip was initiated by the Costa Rican government and that the airstrip was to be used for training activities by Costa Rican forces in preparation for a

---

**1.** Where classified information has been omitted, it has been noted with "* * * *."

feared invasion by Nicaragua. It also alleges that Fernandez misrepresented the nature of his contacts with Quintero.

Counts Three and Four state that Fernandez knew that Oliver North was involved in assisting the resupply of the Contras, and that Fernandez helped to resupply the Contras with weapons and ammunition in September 1986. The indictment charges that Fernandez made false statements to the Tower Commission by asserting that he did not know of North's involvement in the resupply of the Contras and that he did not know that supplies he helped to deliver in September 1986 contained lethal aid.

To defend himself against these charges, Fernandez intended to show that he did not make some of the allegedly false statements, and that others were actually true. With respect to Counts One and Two, he intended to establish the truth of his allegedly false statements concerning the origin and purpose of the airstrip by demonstrating that the airstrip was part of a comprehensive * * * * initiative designed to repel a potential invasion by Nicaragua. With respect to Counts Three and Four, Fernandez intended to establish that CIA * * * * throughout * * * * were intimately involved in the resupply of the Contras, and thus that he never made, and had no motive or intent to make, the allegedly false and misleading statements concerning his lack of knowledge about the resupply program.

To present this defense, Fernandez claimed the need to introduce as evidence certain classified documents. Accordingly, following his indictment he invoked the procedures of the Classified Information Procedures Act ("CIPA"), 18 U.S.C.App. §§ 1 *et seq.* (1982). CIPA "establish[es] procedures for making decisions about the use of such information." *Appeal of the United States by the Attorney General,* 887 F.2d at 466. Section 5(a) of CIPA requires the defendant to notify the court and the prosecutor about any classified information he reasonably expects to disclose at trial. Under § 6(a), the United States may then request a hearing for the court to determine the "use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding." If the court authorizes disclosure of the information under § 6(a), the United States may move that the court order either a substitute statement admitting relevant facts, 18 U.S.C.App. § 6(c)(1)(A), or a substitute summary of specific classified information, *id.* at § 6(c)(1)(B). Section 6(c)(1) states that the court "shall grant such a motion ... if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." If the court denies the substitution motion under § 6(c)(1), the Attorney General is authorized to submit an affidavit to the court barring disclosure of the classified information, 18 U.S.C.App. § 6(e)(1), in which case the court must fashion an appropriate remedy, ranging from dismissal of the indictment to preclusion of testimony, *id.* at § 6(e)(2).

Fernandez filed notices under § 5 of CIPA on June 23, 1989, identifying nearly 5000 documents containing classified information that he proposed to disclose at trial. The government moved to strike the § 5 notice, complaining that the defendant had merely listed documents rather than proffering the specific classified information that he planned to disclose. At a hearing on June 27, 1989, the trial judge suggested, and both parties agreed, that the government should provide Fernandez's attorneys with the specific documents it planned to use in its case-in-chief so that the defense could narrow the scope of the classified information it would reasonably need to use at trial. In addition, the parties agreed that Fernandez should recast his CIPA notice in the form of categories of classified information organized by subject matter rather than as a mere listing of classified documents. The parties believed that this organizational scheme would enable the government to make an informed assessment of the danger of disclosing the information and would allow the trial court to rule intelligently and efficiently on the information's relevance and admissibility.

Accordingly, on July 3 Fernandez filed a second notice under § 5 of CIPA setting forth summaries, organized by subject matter, of the categories of classified information that he reasonably expected to disclose at trial.

On July 10, the district court conducted a hearing under § 6(a) of CIPA to determine the "use, relevance, or admissibility" of the classified information. At the government's request, the trial court went through each subject matter category of classified information to determine each category's relevance and admissibility. In the course of two days of CIPA hearings, the trial court ruled that several categories of classified information were irrelevant and thus not admissible. It also ruled, however, that two categories of classified information were material to Fernandez's defense and could be disclosed at trial.

The first category of classified information admitted by the trial judge concerned three intelligence projects undertaken jointly by the United States and Costa Rica: (1) * * * *, (2) * * * *, and (3) * * * * (collectively referred to as the "projects"). The district court agreed with Fernandez that classified information concerning these programs would corroborate his claim that the airstrip project was part of a larger Costa Rican effort to protect itself against a Nicaraguan invasion, which would in turn support the truth of his allegedly false statements about the origin and purpose of, and his involvement in, the airstrip project.

The second category of classified material that the trial judge authorized for disclosure at trial concerned the location of CIA * * * * (collectively referred to as "locations" * * * *). At the CIPA hearing, Fernandez's attorney argued, and the district court agreed, that Fernandez needed to present the identity and location of these * * * * to the jury in order to demonstrate the CIA's extensive involvement in the resupply operation. One of the * * * * was located * * * * through their operations, were deeply involved in the private benefactor program. The identity and location of these * * * * were relevant because

they would help paint a picture of massive CIA involvement in and knowledge of the resupply of the Contras. This picture, in turn, would support Fernandez's claim that he never made the allegedly false statements (which were never recorded or transcribed), and thus did not lie, and had no motive or intent to lie, concerning his knowledge of North's role in the Contra resupply operation or his knowledge of the nature of the supplies delivered in 1986.

Following the district court's order authorizing the disclosure of information about the locations and the projects, the United States submitted a series of proposed substitutions under § 6(c) of CIPA. The government's proposed substitutions were introduced on July 12, and revised on July 14, 21, and 24. As explained below, the district court rejected these various substitution proposals over the course of several days as inadequate to "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C.App. § 6(c).

In lieu of information about the * * * * projects in Costa Rica, the government offered on July 12 to acknowledge * * * *. The district court rejected these proposed substitutions because they failed to describe the nature and extent of the programs in operation at the same time as the airstrip. The court explained that the substitutions would undermine Fernandez's ability to show the seriousness with which the Costa Rican government took the Nicaraguan threat, the substantial efforts the Costa Rican government took (in the form of the three projects) to address this threat, and the close relationship between the three projects and the airstrip.

On July 14, the government revised its proposed substitutions concerning the projects. Specifically, the government offered to acknowledge that * * * *. The district court rejected the new July 14 proposals concerning the projects as inadequate for the same reasons as the original July 12 proposals.

The final proposal concerning the projects involved the government's July 21

offer to narrow the indictment to eliminate some charges in Counts One and Two concerning the airstrip project. The government conceded that the narrowed indictment continued to contain charges relating to the airstrip project which would require introduction of evidence to show Fernandez's involvement in the project. The district court ruled that Fernandez still needed to introduce documents about the three projects to establish his role in and understanding of the airstrip project.

The district court also rejected the substitution proposals concerning the locations of the * * * *. In place of the information about the location and activities of the CIA * * * * facilities, the government proposed on July 12 to acknowledge that * * * *. The court rejected these proposed substitutions as "insufficient" after reiterating its earlier determination that the identities of the * * * * were critical to Fernandez's defense.

Finally, on July 24, the morning of trial, the government submitted revised proposals which provided that the * * * * locations could be referred to by a number in open court that correlated with a written key provided to the jurors identifying the actual locations. Relying on its July 13 ruling that the actual identity of the * * * * was required to provide Fernandez with a fair trial, the district court rejected these proposals too.

As the case was proceeding to trial following the district court's rejection of the substitution proposals, the Attorney General of the United States intervened to appeal, under § 7(a) of CIPA, the trial court's rulings under § 6(a) and § 6(c) of CIPA. This court stayed trial proceedings on the afternoon of July 24 pending our disposition of the Attorney General's appeal. On appeal, the parties addressed both the Attorney General's standing to appeal under CIPA as well as the merits of the district court's evidentiary rulings. On September 29, 1989, we dismissed the Attorney General's appeal for lack of standing, *Appeal of the United States by the Attorney General*, 887 F.2d 465 (4th Cir.1989), and lifted the stay of trial proceedings without reaching the merits of the trial court's § 6(a) and § 6(c) rulings. Although our decision denied the Attorney General standing to appeal under § 7(a) of CIPA, it stressed that the duties under CIPA more closely related to the protection of national security, such as the authority to file a § 6(e) affidavit to prohibit disclosure of classified information, were left to the discretion of the Attorney General. *Id.* at 471.

Before the trial commenced in district court, on November 22, 1989, the Attorney General filed an affidavit under § 6(e)(1) of CIPA prohibiting the disclosure at trial of any classified information concerning the * * * * or the three projects. The Attorney General's affidavit, corroborated by affidavits of the Director of the CIA, the Deputy Director for Operations of the CIA, and * * * *, detailed the serious damage to national security that would result from disclosure of the classified information.

In response to the § 6(e)(1) affidavit, Independent Counsel filed a memorandum concerning sanctions in which it requested the trial court not to dismiss the indictment. Instead, it urged the trial court to make adverse findings against the government and to narrow the indictment in a manner previously proposed (and rejected) on July 21. After a sanctions hearing on November 24, the district court rejected Independent Counsel's suggestions and dismissed the indictment. The court reasoned that because the information concerning the stations and projects was "essential for the defendant to put forth a defense in this case and to receive a fair trial," and because the "6(e) affidavit prevents the disclosure of all that information," the entire case had to be dismissed with prejudice.

Our earlier decision in this case stated that § 7(a) of CIPA allows Independent Counsel to appeal the district court's relevancy and substitution rulings together with its appeal from the district court's sanction. 887 F.2d at 470. Accordingly, the United States now appeals from (1) the district court's rulings that the information concerning the projects and stations was relevant and admissible, (2) the district court's rejections of the government's pro-

posed substitutions, and (3) the district court's sanction of dismissal. The government does not seek a remand for further findings or further factual development. Rather, it requests that we either reverse the district court's admission of the classified evidence, or order the district court to accept the government's substitution proposals, or require the district court to accept the government's proposed sanctions.

## II.

Our role in this appeal is circumscribed. We are not asked, and we have no authority, to consider judgments made by the Attorney General concerning the extent to which the information in issue here implicates national security. Similarly, neither the prosecutorial decisions in this case nor the possibility of graymail—the "practice whereby a criminal defendant threatens to reveal classified information during the course of his trial in the hope of forcing the government to drop the criminal charge against him," *United States v. Smith*, 780 F.2d 1102, 1105 (4th Cir.1985)—comes within our purview. Instead, we are faced with a series of very narrow, fact-specific evidentiary determinations and with the question whether the defendant could receive a fair trial without the aid of certain evidence.

■ Of course, the evidentiary rulings here were made under the procedural guidelines in CIPA, and we must ensure that CIPA's statutory requirements have been followed. Section 6(c) of CIPA provides for the district court to rule on the "use, relevance, or admissibility" of classified information that a defendant requests to use at trial. In *United States v. Smith*, 780 F.2d at 1106–08, this court considered the standard a court must follow in making a determination under § 6(c). *Smith* held that although the relevance of classified information under § 6(c) should be governed by Fed.R.Evid. 401, all relevant evidence is not automatically admissible under CIPA. *Id.* at 1106. Specifically, we ruled that the admissibility of relevant evidence under § 6(c) of CIPA involves a further balancing of "the public interest in nondis-closure against the defendant's right to prepare a defense." *Id.* at 1107.

*Smith* does not, however, set forth a mechanical balancing rule. Rather, it simply ensures that before admitting classified evidence, the trial court takes cognizance of both the state's interest in protecting national security and the defendant's interest in receiving a fair trial. Although *Smith* requires a court to take into account the government's interest in protecting national security, it also stresses that this interest cannot override the defendant's right to a fair trial. Thus, *Smith* requires the admission of classified information that is "helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 1107 (citation omitted).

Were it otherwise, CIPA would be in tension with the defendant's fundamental constitutional right to present a complete defense. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). "[T]he Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense'," *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (citing *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984)), and "the right to present a defense . . . is a fundamental element of due process of law," *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Here, the government is simultaneously prosecuting the defendant and attempting to restrict his ability to use information that he feels is necessary to defend himself against the prosecution. Although CIPA contemplates that the use of classified information be streamlined, courts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence.

■ The standard of review of the district court's evidentiary rulings is a deferential one. "The trial court has wide discretion [in ruling on relevance and admissibility], . . . and its determination will not be

overturned except under the most 'extraordinary' circumstances." *United States v. Heyward*, 729 F.2d 297, 301 n. 2 (4th Cir. 1984) (citation omitted). "[T]rial judges are much closer to the pulse of the trial than we can ever be, and 'broad discretion' is necessarily accorded them [in ruling on admissibility]." *United States v. Tindle*, 808 F.2d 319, 327 n. 6 (4th Cir.1986) (quoting *United States v. Juarez*, 561 F.2d 65, 71 (7th Cir.1977)). The trial court was immersed in the complicated facts of this case for several months, and its familiarity with the particulars of this prosecution far exceeds our own. Accordingly, we must review the trial court's § 6(a) admissibility rulings, as with any other determination of relevance and admissibility, under an abuse of discretion standard. *United States v. Anderson*, 872 F.2d 1508, 1515, 1518 (11th Cir.1989). The abuse of discretion standard also applies to the trial court's decision to reject a proposed substitution under § 6(c). *United States v. Clegg*, 846 F.2d 1221, 1224 (9th Cir.1988).

With these principles in mind, we turn to consider the trial court's evidentiary rulings under CIPA.

### III.

■ We first review the trial court's admission of information pertaining to the three * * * * projects in Costa Rica, as well as its rejection of the government's proposed substitutions for this information. We conclude that the court did not abuse its discretion either in admitting this evidence or in rejecting the government's proposed substitutions for this evidence.

### A.

Fernandez is charged in Counts One and Two with representing to the CIA Inspector General that the airstrip project was initiated by the Costa Rican authorities to enhance their national security. The indictment alleges that this representation was false and misleading because in fact Fernandez initiated the airstrip as a base for resupply of the Contras. Fernandez's primary defense to this charge is that his statements to the Inspector General about the genesis and purpose of the airstrip were true. In order to demonstrate the truth of his assertions that the airstrip was designed by the Costa Ricans to promote their security concerns, Fernandez claims that he needs to introduce evidence about three classified * * * * projects—* * * *. Fernandez maintains that these * * * * projects were all undertaken as part of a joint United States–Costa Rican effort to address the military threat posed to Costa Rica by Nicaragua, and that the airstrip project was part of this broader Costa Rican national security effort. Thus, evidence about the three projects and their relationship to the airstrip supports the truth of his allegedly false statements about the airstrip.

The district court agreed with Fernandez, ruling that information relating to these three projects was central to the charges against him and was thus admissible. With regard to the admissibility of the * * * *, the court stated:

* * * * * *

I think [Fernandez] is entitled to that kind of evidence. I think positive steps that were taken that shows the concern of the Costa Ricans for that airstrip is the guts of his case....

* * * * This is right at the heart of the allegations [the government has] made. And I think that [Fernandez] is entitled to use the facts that support the [Costa Rican's] concern. Simply standing up and saying that they are concerned isn't sufficient.

The court also ruled that although the * * * * program and the * * * * "may not be as closely tied as * * * *," they were still relevant to the charges against Fernandez and thus were admissible. In making these rulings, the trial judge stressed that he was deciding only the narrow question of admissibility, and he assured the government that he would later allow them the opportunity to propose substitutions.

The government raises three objections to the admission of this evidence. First, it reargues the relevancy of the projects to the charges against Fernandez. Second, it

contends that the district court failed to examine specific classified documents and ruled too broadly that everything pertaining to the three programs was relevant to Fernandez's defense. Third, the government argues that the trial court failed to apply the balancing test of *United States v. Smith*. We address each contention in turn.

The district court clearly did not abuse its discretion in determining information about the projects to be relevant. Fernandez is accused of falsely stating that the airstrip project was a Costa Rican initiative designed to address the Nicaraguan threat. Fernandez claims that the airstrip project, like the three classified projects he wanted to disclose at trial, was part of a joint U.S.–Costa Rican project designed to address the danger to Costa Rican national security posed by the Nicaraguan military. Information about the three projects thus directly substantiates the truth of his alleged false statements. It also shows that he lacked either the motive or the intent to lie to the Inspector General of the agency—the CIA—that he was working for and that was closely involved in the projects. Whether a jury would believe Fernandez is, of course, uncertain, but to rule this evidence irrelevant under § 6(a) of CIPA would be to vitiate much of the force of the defense. Accordingly, the district court correctly ruled, and in any event did not abuse its discretion in ruling, that the information on the three * * * * projects in Costa Rica was central to Fernandez's defense.

■■ The government further contends that the trial court abused its discretion because it failed to examine any of the documents concerning the projects that Fernandez identified in his CIPA notice. However, § 6(a) of CIPA requires the district court to determine the "use, relevance, or admissibility *of classified information*" (emphasis added), not particular classified documents. Moreover, the procedure of ruling on categories of information supported by specific documents rather than on each of hundreds of specific documents one at a time was agreed to by the govern-

ment at the June 27, 1989, notice hearing under § 5 of CIPA. Again, at the beginning of the July 10 hearing to determine admissibility of the classified information under § 6(a) of CIPA, the government's attorney stated that he believed that the court should proceed by ruling on categories of information: "[I]t is [the government's] view that what we need to do is to *go through the categories* and determine whether or not they are relevant, admissible, and what use they are admissible for" (emphasis added). It is incongruous for the government to be complaining about the very CIPA process which it urged on the court below.

■ Nor was the scope of the district court's admission of evidence either vague or overbroad. At numerous points during the CIPA hearings, the district court stated the scope of its rulings on relevancy:

> [Fernandez] is entitled to show that the program was there, it was in existence, that it was a substantial program aimed at certain things.
>
> .         .         .         .         .
>
> [T]he defendant ... is permitted to show that ... there were three operations that were set up ... in the same kind of way [as the airstrip], that shows how they were done, the purpose for doing them, who instigated them, and for what purposes. And also the magnitude of them.
>
> .         .         .         .         .
>
> I am going to let [the defendant] talk about how [the projects] were set up, who requested them, the magnitude of the projects.

The trial court thus defined its admissions quite sharply to include the origin, purpose, and scope of the three projects.

In addition, the trial judge assured the government numerous times that he would not allow the scope of these admissions to be exceeded, and that he would not allow the defendant to focus on the programs unnecessarily:

> There is a limit ... on the amount of detail.... We are not going to try the full implication of the program.
>
> .         .         .         .         .

I am not going to let [the defendant] dwell on [the projects] in an unlimited way in the sense that minutia is not going to come in.

.    .    .    .    .

I am not going to let [the defendant] get on the stand and just talk forever about these projects.

The trial judge could hardly have been more specific concerning the scope of his admission. As the trial judge correctly stated at the CIPA hearing, he could not in advance of the actual use of the information at trial be any more exact about the scope of his ruling: "I can't tell you until we get to trial where I am going to cut him off in the amount of detail that he is going to use."

■ Finally, we find no merit in the government's contention that the district court failed to follow the dictates of *United States v. Smith.* While the government laments what it perceives as the failure of the trial court to perform an "express balancing" of the various interests involved, the transcripts of the CIPA hearings reveal that the trial judge's CIPA rulings were informed by a sensitivity both to the costs of disclosure and to the requirements of a fair trial. When the government invoked *Smith* at the CIPA hearing on July 13 the trial court acknowledged its awareness of these facts and stated:

[W]hat I have been doing [during two days of CIPA hearings] is weighing the interests of security against the necessity for the defendant to have certain information in order to receive a fair trial in this case.

Furthermore, *Smith* makes clear that a finding that particular classified information is necessary to the defense is enough to defeat the contrary interest in protecting national security. *Smith,* 780 F.2d at 1107. In addition to the balancing inherent in all of the trial court's deliberations, the court twice made specific findings that the projects were necessary to the defense:

I think positive steps that were taken that shows the concern of the Costa Ricans for that airstrip is the guts of [the defendant's] case.... This is right at

the heart of the allegations you all have made.

.    .    .    .    .

And the other projects that were ongoing at the same time that [the defendant] was involved in [the airstrip project] I find are very relevant and necessary to his defense in this case.

Clearly, then, the trial court fulfilled the requirements of *Smith.*

**B.**

The government next argues that even if the classified information concerning the three projects was properly admitted, the trial court abused its discretion in rejecting the government's proposed substitutions. CIPA contemplates that the government may propose substitutions for relevant classified information, and that the trial court shall accept these substitution proposals if they "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C.App. § 6(c)(1). We recognize that substitutions play an important part in the CIPA scheme, and we accordingly review them with some care.

The government made two substitution proposals concerning the projects. The original proposals spoke very generally about Costa Rican concerns regarding the Nicaraguan threat. It also stated in general terms that Costa Rica sought and received assistance from the United States in the form of several projects in which Fernandez was involved. The district court rejected these proposals as inadequate to allow Fernandez to put on the kind of defense that the court had previously determined to be necessary:

[I]t seems to me [that] for you to expect to indict and accuse the defendant of lying about who instigated this airstrip and then to prevent him from showing the serious undertakings of that Government in other areas that would tend to corroborate this undertaking, and reduce him to a simple general statement that,

oh yeah, people were concerned, really doesn't allow this man to defend himself.

.　　.　　.　　.　　.

[W]hat you have prevented the defendant from doing by this substitution is to show the seriousness with which the Costa Rican government took the situation and got other specific programs started.

.　　.　　.　　.　　.

If all [the Costa Ricans] had was a general concern about the situation, for this defendant to say, oh, they instigated the airstrip, that is the only specific thing they did because of their general concern, well, that leaves him in a very poor position to defend his case.

The government's revised substitutions fared no better. The new substitutions spoke in general terms about * * * *. The trial court rejected these new proposals as similarly inadequate to the prior ones:

I find that this stipulation does not meet what the defendant should be allowed to show.... I think the defendant must have the latitude of showing how these projects were instigated, who requested them, how they came about, to show the basic magnitude of the programs so that he can show the concerns of the Costa Rican government. And this submission that I have here just simply doesn't meet that.

We do not think the district court abused its discretion in ruling that the substitutions failed to "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C.App. § 6(c)(1). The proposed substitutions fell far short of informing the jury about that which the trial judge had already determined to be essential to Fernandez's defense, namely, information about the origin, purpose, and scope of the three projects. The substitutions would have precluded the defense from demonstrating the integral relationship between the airstrip project about which he is accused of lying and the other three projects whose purposes support his version of events. Fernandez himself would have been unable to testify about his understanding of the

projects and their relationship to one another, and would have been precluded from introducing numerous classified CIA communication cables that he authored that would flesh out the common purpose of the projects (including the airstrip operation). In addition, the substitutions would have hampered Fernandez's ability to demonstrate the intimate involvement of the Costa Rican government in the projects and the closeness of U.S.–Costa Rican cooperation concerning them. For example, the substitution proposal which concedes that * * * * does not begin to capture the continuous and intimate interaction between Fernandez and * * * * with regard to all four projects and their relationship to Costa Rica's concern about the Nicaraguan threat.

The charge that Fernandez misrepresented the purpose of the airstrip project essentially calls into question his version of the truth about what he did as CIA station chief in Costa Rica. To address this charge requires Fernandez to paint a concrete and detailed picture of his working environment as he saw it. We agree with Fernandez's contention that the substitutions would preclude the defense from "present[ing] a coherent case of its own, since it would be shackled to a script written by the prosecution." If the vague, extremely abbreviated descriptions of the projects were accepted as exclusive substitutes for Fernandez's own testimony about his role in and understanding of the projects, for classified cables written by him that corroborated his understanding, and for his direct and cross-examination of witnesses involved in these projects, Fernandez's constitutionally guaranteed ability to present a defense would be severely compromised. The substitutions would have required the jury to judge Fernandez's role in the airstrip project, and thus the truth of his statements about it, in a contextual vacuum. They would not have provided Fernandez with "substantially the same ability to make his defense," and the court below did not abuse its discretion in rejecting them.

Nor, finally, did it abuse its discretion in ruling that the government's proposed nar-

rowing of the indictment failed to satisfy Fernandez's need to introduce classified information about the three projects. Although this proposal would have eliminated some of the charges in Counts One and Two concerning false statements about the airstrip project, the counts still contained allegations that Fernandez lied about the nature of his contacts with Raphael Quintero. However, these alleged misrepresentations consisted of denials of dealings with Quintero concerning the airstrip. The government concedes that with regard to the remaining charges concerning Quintero, it would still need to introduce evidence demonstrating Fernandez's involvement in the airstrip project. Thus, the district court acted within its discretion in ruling that the relevance of the projects "really goes broader than" the eliminated charges and in denying the motion to narrow the indictment in lieu of admitting classified information about the projects.

## IV.

■ We next review the trial court's materiality and substitution rulings concerning the locations of the * * * * CIA facilities. We conclude that neither the district court's admission of the evidence nor its rejection of the government's substitution proposals constitutes an abuse of discretion.

### A.

Fernandez is charged in Counts Three and Four with falsely stating to the Tower Commission that (1) he did not knowingly participate in the resupply of lethal aid to the Contras in September 1986 and (2) he did not know about Oliver North's role in the resupply operation. Fernandez's defense is that he did not make these statements, and that he had no motive or intent to make them. Because the government investigators never recorded or transcribed his allegedly false and misleading statements, Fernandez was forced to make out this defense through indirect means. One strategy to prove that he never made the statements and had no reason to do so involved introducing evidence that would demonstrate that the CIA station which he headed, * * * * other CIA * * * * in * * * *, and CIA Headquarters in Washington were all deeply involved in and thus explicitly aware of the resupply operation. This showing was designed to convince the jury that it was highly unlikely that he would misrepresent a matter of which the CIA was intimately aware.

One set of the documents Fernandez wanted to introduce would show that the private benefactors made several resupply drops of lethal material to the Contras from the Ilopango airfield between December 1985 and September 1986. * * * * The second set of classified documents would demonstrate that CIA officers * * * * worked closely with the private benefactors in connection with the benefactors' agreement to deliver humanitarian supplies authorized by an August 1985 Congressional appropriation. The CIA was officially charged with monitoring the delivery and distribution of this humanitarian aid; as a result, CIA officers * * * * came into frequent contact with the very private benefactors who were at the same time delivering lethal weapons to the Contras. The documents would also demonstrate that all * * * * provided CIA Headquarters with detailed information about the resupply program, and that CIA Headquarters urged * * * * to provide encouragement and assistance to the lethal aid resupply operation.

The district court determined that documents revealing the location and identity of the * * * * CIA * * * * were relevant. The district court ruled that these documents were essential to Fernandez's contention that the CIA knew about and participated in the resupply of the Contras. The court agreed that if Fernandez could establish such massive CIA participation, doubt would be cast on whether he actually made the allegedly false statements or whether he had any incentive whatsoever to lie about a resupply operation of which the CIA was intimately aware.

The United States contends on appeal, as it did below, that the identity of the * * * * CIA locations bears no material

relation to the specific charges against Fernandez. It argues that the trial court "failed to conduct any express balancing of the purported relevance of the * * * * to the defense and the harm resulting from such disclosure as identified in the affidavits submitted by the intelligence agencies." The government maintains that if the trial judge had correctly performed the *Smith* balancing test, he would have concluded that the locations of the * * * * were neither "necessary" nor "essential" to the defense and thus were not admissible.

We disagree. It was well within the trial court's discretion to conclude that information about the location and activities of the * * * * CIA * * * * was material to the charges against Fernandez. Fernandez was charged with misrepresenting his involvement in and knowledge of various aspects of the resupply operation. He wanted to tell the jury about the precise locations of the * * * * CIA * * * * in order to explain the * * * * close cooperation with the private benefactor resupply operation. He also wanted to demonstrate, through evidence detailing the location and existence of the * * * *, CIA Headquarters' detailed knowledge of and involvement in the resupply operation. As Fernandez asserts,

> [i]n order for his alleged activities and statements concerning the [resupply operation] to be assessed fairly, the jury must be told precisely *who* at the CIA supported the [resupply] operation, *how* they did it, *where* they did it, *why* they did it, and *who else* at the CIA knew about it. All of this directly implicates the * * * *.

(Emphasis in original.) The demonstration of widespread CIA involvement in the resupply operation, if successful, would be crucial to Fernandez's defense that he did not lie to or mislead the Tower Commission about his knowledge of North's role in the operation, or about his knowledge of the type of supplies he assisted in delivering to the Contras in 1986. It would also go to whether Fernandez possessed the requisite criminal intent to make the allegedly false statements, since numerous persons throughout the CIA were deeply involved in the project which he purportedly misrepresented.

Again, whether the jury would believe Fernandez's defense is speculation. But to preclude the jury from considering evidence relevant to this defense would be to deprive him of fundamental Constitutional protections. The district court was clearly in the best position to make this relevancy determination. It had an intimate familiarity with the information in issue; it held extensive CIPA hearings for over two days; and it was able to question the attorneys in detail about the relevance of the classified documents. Given the manifest plausibility of the district court's rulings concerning the locations, we cannot say that it abused its discretion in admitting the evidence.

Moreover, for many of the same reasons stated in our discussion of the admissibility of information concerning the locations, the district court did not misapply *Smith*. The district court made clear that throughout the entire § 6(a) hearing on admissibility, it was "weighing the interests of security against the necessity for the defendant to have certain information in order to receive a fair trial." As explained earlier, *Smith* states that a defendant's interest in a fair trial will prevail for purposes of § 6(a) relevancy determinations where there is a finding by the trial court that the relevant information was necessary to the defense. Thus, the court's specific finding that the stations "are necessary for the defendant's defense to be divulged" satisfies the requirements of *Smith*.

The government further contends that the trial court abused its discretion because it "failed to examine any documents noticed by defendant containing classified information regarding the CIA facilities." However, as we explained with regard to the trial court's rulings on the relevancy of the projects, we disagree with the government's contention that the district court erred by ruling on categories of classified information rather than on each specific document. The procedure employed by the

district court is appropriate under CIPA and was agreed to by the parties.

### B.

The government maintains that even if the identity of the * * * * were relevant, its proposed substitutions provided Fernandez with all the relevant facts he requested. Our review of the record, however, convinces us that the trial court did not abuse its discretion in rejecting the proposed substitutions.

As we stated earlier, a trial court must accept the government's proposed substitutions "if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C.App. § 6(c)(1). The government's first proposed substitution for the locations basically would have allowed Fernandez (1) to refer to the * * * *, (2) * * * *, and (3) * * * *.

Fernandez argued, and the district court agreed, that these substitutions would have prevented Fernandez from demonstrating the degree and nature of the CIA's involvement with the private benefactor resupply operation. In rejecting the substitutions, the district court stated that it had already ruled on the relevance of the locations, and suggested that the substitutions, though sufficient for other purposes, were insufficient for the material purposes requested by Fernandez. The judge emphasized that he reached this decision after weighing the interests of national security against the need to provide Fernandez with a fair trial. He concluded by emphasizing: "I believe that *the identity* of these * * * * is necessary for the defense, and would rule that your substitution would not be adequate." (Emphasis added.)

It was clearly within the district court's discretion to conclude that the government's vague, compressed descriptions about the CIA's general presence in the region and about its general familiarity with the resupply operations were no substitute for live testimony from witnesses and the introduction of actual documents detailing the CIA's intimate involvement with the resupply operation. For example, the substitutions would not have allowed Fernandez to show that * * * * the private benefactor operation at Ilopango airfield from which resupply operations commenced. Nor would they have allowed Fernandez to introduce numerous CIA cables, some authored by Fernandez himself, concerning the CIA's involvement in the resupply operation. The substitutions would also have hampered Fernandez's efforts to cross-examine CIA and other government officers from whom the United States planned to elicit testimony at trial. Again, this detail was necessary because the linchpin of Fernandez's defense against the charge that he misrepresented his role in the resupply operation was to use the fact of massive CIA involvement in the resupply operation in order to prove that he did not misrepresent, and had no reason to misrepresent, his involvement in it. The degree and nature of CIA involvement was thus crucial to the defense strategy, and could not be captured by terse substitutions acknowledging the CIA's "general presence" in the area and its general intelligence information about the resupply operation. Far from constituting an abuse of discretion, the trial court's rejection of the location substitutions was necessary to preserve Fernandez's fundamental right to present a full defense.

The district court's rejection of the government's proposed substitution presented just prior to jury selection on the morning of trial also does not amount to an abuse of discretion. The government made this belated proposal to the trial judge ten minutes after jury selection was set to begin. The proposal, in its entirety, was as follows:

What the Government proposes is as follows. * * * *

Fernandez's attorney objected to the substitution by noting:

This court has ruled time and time again that the specific locations are crucial to the defense in this case. It is going to be necessary for the defense to identify on maps so the jury will be able to see graphically where these various locations

are in order to tell the story that needs to be told in order to defend Mr. Fernandez.

Before ruling on the government's literally last-minute substitution proposal, the district court noted the inappropriateness of the government's timing:

I guess I am kind of at the point that I am getting a little impatient with the pace at which we are moving here. It is now ten minutes after ten, and we were supposed to start selecting a jury at 10 O'clock this morning. We had a CIPA hearing better than a week ago. In fact, we had the hearing over two days. My ruling was very clear.

The district court rejected the belated proposal as "really a repeat of what [it] ruled on better than a week ago," and reasserted its earlier decision that "the identity of these * * * * is relevant to this defendant's case."

For several reasons, we cannot conclude that the district court's rejection of the key card proposal represented an abuse of discretion. First, the proposal was untimely. The trial judge had already held two days of hearings on July 13 and 14, 1989, to consider the government's substitution proposals. It also entertained substitution motions on July 21, three days before trial was set to begin. The government thus had numerous opportunities to present substitution motions, and its proffer of a new proposal to the district court ten minutes after the trial process was supposed to have begun did not guarantee its most propitious reception.

In addition, the key card proposal, though ingenious, is an artificial means of presenting evidence. Although embellished on appeal, the government's presentation of the proposal before the district court was sketchy at best. Perhaps in part because the key card proposal was presented in a belated and hurried fashion, the government never made clear to the trial judge, and indeed it remains unclear to us, how much latitude the key card substitutes would give Fernandez to tell his story about the CIA involvement in the resupply operation. The litigants continue to disagree strongly about the scope of the key card proposal. To take but one example, Fernandez contends that the card system would not allow him to point out in open court * * * * (a point central to his defense), while Independent Counsel insists that it would. CIPA charges the government with proposing the substitutions, 18 U.S.C.App. § 6(c)(1), and we think the burden must be on the government to delineate the substitutions' precise scope before the trial court. Moreover, it was within the district court's discretion to believe that, in addition to its artificiality, the complicated key card system might confuse or distract the jury. With this system, the * * * * would be referred to as * * * * and the witnesses and the jury would apparently consult a key card to discover their actual locations. Jurors would thus have to make continuous reference to a key card and a map while at the same time focusing on the content of the testimony.

It seems clear, therefore, that the key card proposal was far from an interchangeable substitute for the real thing. To be sure, not every substitution that puts the defendant at a disadvantage need be rejected under CIPA. *See* 18 U.S.C.App. § 6(c)(1). But in light of the belatedness and artificiality of the proposed substitution, the uncertainty about its scope, its potential to confuse the jury, and the district court's prior valid finding that the actual identity of the * * * * was essential to Fernandez's defense, we cannot say that the trial court abused its discretion in rejecting it.

V.

■ Under § 6(e)(1) of CIPA, when "the United States files with the court an affidavit of the Attorney General objecting to the disclosure of the classified information at issue, the court shall order that the defendant not disclose or cause the disclosure of such information." The government lastly argues that the district court erred in dismissing the entire indictment in response to the Attorney General's filing of the § 6(e)(1) affidavit. It contends that the trial court should instead have narrowed the indictment and made adverse findings

against the government. For the reasons stated below, we are not persuaded.

### A.

■ Section 6(e)(2) of CIPA provides that in response to the filing of a § 6(e)(1) affidavit, a district court "shall dismiss the indictment" unless it "determines that the interests of justice would not be served by dismissal of the indictment." This is the first case in which the Attorney General has filed a § 6(e)(1) affidavit to prohibit the admission of classified information, the first instance in which a district court has exercised the sanctions power under § 6(e)(2), and thus the first time in which such a dismissal has been reviewed on appeal. We believe that this review should accord significant deference to the district court's ruling on sanctions. We conclude, and both parties agree, that the district court's dismissal of the indictment should be reviewed under an abuse of discretion standard.

### B.

The government proposed two sanctions in response to the § 6(e)(1) affidavit. First, it proposed once again to narrow the indictment to eliminate the charges in Counts One and Two concerning Fernandez's alleged false statements about the airstrip

project. The government's second proposal involved the following adverse admissions:

\*　\*　\*　\*　\*　\*

The trial court rejected these proposals. It reasoned that because the information concerning the stations and projects was "essential for the defendant to put forth a defense in this case and to receive a fair trial," and because the "6(e) affidavit prevents the disclosure of all that information," the entire indictment must be dismissed with prejudice.[2] In light of the extended discussion above explaining why the trial court did not err in determining that classified information about the projects and stations was essential to Fernandez's defense, the trial court's sanction of dismissal was necessary and appropriate, and was not an abuse of discretion.

The inadequacy of the government's suggested alternative sanctions makes clear the correctness of the trial court's dismissal of the entire case. The government's proposal to narrow the indictment to remove the charges about Fernandez's alleged misrepresentations concerning the airstrip had already legitimately been rejected by the district court as insufficient to ensure Fernandez a fair opportunity to present a full defense.

---

**2.** The trial court's analysis is worth quoting at length:

> ... I certainly agree that [CIPA] would require that the least severe sanctions that can be imposed be imposed in a situation where a 6(e) affidavit has been filed. But we have had lengthy hearings in this case on the questions of what classified material could be or should be used by the defendant in this case. We have examined several areas and categories of evidence. Some of those categories were ruled not to be relevant to the defendant's case. There were numerous other areas where substitutions were made for certain evidence that the defendant wished to have disclosed. We then came down to the four areas in question now dealing with \* \* \* \* and programs and activities involved which I ruled to be essential for the defendant to put forth a defense in this case and to receive a fair trial.
>
> The 6(e) affidavit prevents the disclosure of all of that information. The government, or special counsel[,] now asks essentially for a rehearing of the rulings previously made in

regard to the admissibility and the necessity of the defendant to divulge this information.

> ... [T]hese four areas of evidence that I ruled to be relevant have been known for a number of weeks. In fact, this case has even gone down to the Court of Appeals on the Government's motion, and they have issued an opinion in the meantime. It has been quite some time that these areas have been known, and there has been a lot of time for any additional substitutions that anyone wished to work out to be made.
>
> And so, any request for a rehearing of this previous ruling as to the admissibility of these areas would be denied. And in accordance with my previous ruling, this is information that is essential to this defendant to enable him to defend himself against the charges in this case, and the narrowing of one of the charges would not change that situation as I have already ruled.
>
> And for those reasons, the appropriate sanction in this case would be for this case to be dismissed. And it will be dismissed with prejudice.

The proposed adverse findings and admissions were similarly inadequate. As an initial matter, we are unsure about the status of these proposals. There was no evidence that the Attorney General had approved this public disclosure of the identity of the CIA * * * *, and in light of his filing of a § 6(e)(1) affidavit prohibiting disclosure of this information, it was anything but certain that he would have approved. At the sanctions hearing on November 24, 1989, Independent Counsel conceded that it lacked Executive Branch approval for the new substitution proposal about the * * * *. Without such approval, we are uncertain about Independent Counsel's authority to propose this substitution. *See Appeal of the United States by the Attorney General,* 887 F.2d at 471 (Executive Branch duties concerning "the protection of information important to the national security have [not] been taken from the Attorney General and delegated" to Independent Counsel).

In any event, for all of the reasons previously advanced about why the location and details of the CIA * * * * were central to the charges against Fernandez, it was well within the trial court's discretion to conclude that the proposed findings and admissions were inadequate to ensure Fernandez a fair trial. Much of the proposed admissions and findings goes over old ground, and is really nothing more than earlier substitutions advanced at a later stage. As we have already explained, the trial court did not abuse its discretion in ruling that the government's general admission that the CIA was "familiar with" the resupply program is inadequate to ensure that Fernandez can present a meaningful defense, or in ruling that abbreviated substitutions about the locations could not provide Fernandez with "substantially the same ability to present his defense" as would testimony and other live evidence about the actual locations of and details about the three stations.

Within its discretion the trial court ruled the evidence about the stations and projects to be necessary to Fernandez's defense and thus admissible under CIPA. For national security reasons, the Attorney General prohibited the admission of this crucial information by filing the § 6(e)(1) affidavit. The trial court did not abuse its discretion in determining that without the evidence excluded under § 6(e)(1), Fernandez's defense would be eviscerated. It follows that it did not abuse its discretion in dismissing the entire indictment.

## VI.

All of the charges against Joseph Fernandez concern what he was doing as the CIA station chief in Costa Rica in the mid–1980's, including the nature of his assignments, the persons with whom he worked, and the context in which he carried out certain acts. Because his trial was essentially going to be about the truth of his version of these activities, he must be allowed to tell the jury exactly what he was doing as the CIA's station chief in Costa Rica. The nature of the charges against him demand that he be able to place his job before the jury in a concrete, palpable context, and that he be able to explain his understanding of the world in which he worked. Only against such a background could the jury realistically and fairly evaluate his allegedly false statements. The district court acted within its discretion in determining that the government's attempt to exclude evidence necessary to demonstrate this background, as well as its effort to require the defendant to use abbreviated and lifeless substitutions for this crucial evidence, would have deprived Fernandez of any real chance to defend himself. Thus, the judgment of the district court is

AFFIRMED.