**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 11-4701**

———————————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MICHAEL ANTHONY HICKSON,

Defendant – Appellant.

———————————

**No. 11-4708**

———————————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ALVITA KAREN GUNN,

Defendant - Appellant.

———————————

**No. 11-4711**

———————————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ISAAC JEROME SMITH,

Defendant – Appellant.

---

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, District Judge. (8:09-cr-00213-RWT-2; 8:09-cr-00213-RWT-4; 8:09-cr-00213-RWT-3)

---

Argued: December 6, 2012          Decided: January 24, 2013

---

Before SHEDD, DIAZ, and THACKER, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Shedd wrote the opinion, in which Judge Diaz and Judge Thacker joined.

---

**ARGUED:** Andrew Robert Szekely, LAW OFFICES OF ANDREW R. SZEKELY, LLC, Greenbelt, Maryland; Matthew McGavock Robinson, ROBINSON & BRANDT, PSC, Covington, Kentucky, for Appellants. Adam Kenneth Ake, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Michael Lawlor, LAWLOR & ENGLERT, LLC, Greenbelt, Maryland, for Appellant Isaac Jerome Smith; Elita C. Amato, Arlington, Virginia, for Appellant Alvita Karen Gunn. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

2

SHEDD, Circuit Judge:

A jury convicted Michael Hickson, Isaac Smith, and Alvita Gunn of money laundering, conspiracy to commit wire fraud, and multiple counts of wire fraud based on their participation in a massive Ponzi scheme. On appeal, Hickson, Smith, and Gunn challenge the district court's decisions to give the jury a willful-blindness instruction, admit an email from an unavailable declarant into evidence, and deny their motion for recusal. Individually, Hickson challenges the district court's decision to deny his motion to continue the trial to obtain substitute counsel, while Smith and Gunn challenge the court's refusal to sever their trial from Hickson's trial. For the following reasons, we reject these contentions and affirm.

I.

A.

This case arises out of a massive Ponzi scheme that originated in the Washington, D.C., metropolitan area. Metro Dream Homes ("MDH")[1] promised investors that it would pay off their mortgages in five to seven years if the investors would

---

[1] The scheme involved related companies as well, including POS Dream Homes and Metropolitan Grapevine LLC. We refer to all of the companies as MDH for simplicity.

enroll their home for a one-time investment of $50,000.[2]  MDH told investors that it invested in automated teller machines, point-of-sale vending machines (selling items such as calling cards), and electronic billboards (essentially flat-screen televisions that displayed advertisements) to generate revenue to pay the investors' mortgages.  Eventually, the scheme grew from giving small talks to local investors to making presentations to more than 500 people in luxury hotels in New York and Los Angeles.

Hickson, Smith, and Gunn all worked for MDH.  Hickson served as the chief financial officer from December 2006, Smith as the president from mid-2006 until summer 2007, and Gunn as the chief financial officer and then as a senior vice president after Hickson's arrival.  All three worked under Andrew Williams, the chief executive officer who was also charged for his role in MDH.[3]

In reality, MDH generated virtually no revenue from its investments and was instead dependent on new investors to pay the amounts due to previous investors.  In August 2007, the

---

[2]  Additional homes could also be enrolled, each for an additional $50,000.  The more homes an investor enrolled, the more benefits (such as sitting on the Junior Board of Directors) an investor would receive.

[3]  The case against Williams was severed from the cases against Hickson, Smith, and Gunn.

Washington Post ran a story about MDH that raised questions about the validity of MDH's business model. Later that same month, Maryland officials began investigating the company and ultimately issued a cease-and-desist order prohibiting the enrollment of new investors. MDH went to federal court to enjoin the state from enforcing this order, but the district court refused to do so because the court believed MDH may in fact have been a Ponzi scheme. A Maryland state court eventually ordered MDH into receivership, which revealed debts of at least $44 million, liquid assets of less than $500,000, sixty-six automobiles, and that MDH's investments were essentially worthless. An Internal Revenue Service investigation revealed that the scheme had over 1,000 victims and that of the $78 million received from investors, $42 million was paid back to other investors.

B.

Based on their roles with MDH, Hickson, Smith, and Gunn were all charged with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; fifteen counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and one count of money laundering, in violation of 18 U.S.C. § 1956(h).

Additionally, Hickson was charged with making a false declaration before a court, in violation of 18 U.S.C. § 1623.[4]

A week into trial, Hickson told the court that his relationship with his lawyer, Anthony Martin, was broken and that he had lost confidence in Martin. Hickson asked the court to dismiss Martin as his attorney and grant a short continuance for Hickson to obtain substitute counsel. Hickson explained that he did not believe Martin adequately understood the financial complexities of the case and appeared not to know the witnesses. The district court, outside the presence of the Government's lawyers, made further inquiries. Martin denied being unprepared[5] or unavailable.[6] On multiple occasions, Hickson raised his objections to having Martin represent him, and each time the district court noted that Martin was

_____

[4] Smith was also charged with bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. This count was severed from the other counts, and the Government eventually dismissed that count at sentencing after Smith's convictions on the other counts.

[5] Martin had spent hundreds of hours preparing this case, examined more than one hundred boxes of documents, and worked with a forensic accountant in preparing for trial.

[6] Hickson notes that Martin was unavailable for over a month before trial but acknowledges that Martin was involved in a capital-eligible trial during that time. As for the weekend preceding Hickson's attempt to dismiss Martin, Hickson claims that Martin was unavailable to meet, a position with which Martin disagreed before the district court, as Martin stated that he offered to meet with Hickson that Saturday, despite that day being Martin's birthday and anniversary.

effectively representing Hickson and Hickson needed to work with Martin. Martin eventually stated that he had never seen this side of Hickson before and that their relationship appeared to have broken down. Martin told the court, however, that he would be willing to continue representing Hickson if that was what the court wanted him to do. The district court denied Hickson's motion for a continuance, noting that no lawyer could adequately prepare for such a complex trial in just a few days and that the trial would not be postponed for a new lawyer to prepare.

The next day, Hickson sought to dismiss Martin and proceed pro se. The district court engaged in a thorough colloquy with Hickson and ultimately told Hickson that he could either proceed pro se or with Martin as his attorney. Hickson chose to represent himself. Martin was appointed as stand-by counsel with Hickson's approval.

After Hickson made this decision, Smith moved to sever his trial from Hickson's. He repeatedly renewed this motion later in the trial, joined once by Gunn, and Smith also moved for a mistrial, based on Hickson's performance. The district court denied the motion, observing that Hickson's allegedly deficient performance was no worse than some lawyers who appeared in court and that Hickson had "not done anything terribly extraordinary that . . . would rise up to the level that would mandate a mistrial or severance." J.A. 1669.

7

During trial, Hickson testified in his own defense, the only one of the three defendants to do so. Hickson stated that he warned Williams and others, including Smith and Gunn, of the problems at MDH but that no one heeded his warnings. Along with this testimony, he also introduced presentations he had prepared in November 2006 and July 2007 about the situation at MDH.

The jury convicted Hickson, Smith, and Gunn of conspiracy to commit wire fraud, wire fraud, and money laundering, and Hickson of making a false declaration before a court. All three defendants moved for new trials: Hickson on the basis of not being granted a continuance to obtain new counsel and Smith and Gunn on the basis of not having their trials severed from Hickson's. The district court denied these motions, and it sentenced each defendant to a term of imprisonment: Hickson to 120 months, Smith to 70 months, and Gunn to 60 months. All three defendants timely appealed.

## II.

On appeal, Hickson, Smith, and Gunn first challenge the district court's decision to give the jury a willful blindness instruction, arguing that the instruction was not supported by any evidence that they deliberately ignored information that MDH was a fraud. We disagree.

We review a district court's decision to give a willful blindness instruction and the content of that instruction for abuse of discretion. United States v. Jinwright, 683 F.3d 471, 478 (4th Cir. 2012). The Government can prove the knowledge element of a crime by showing that the defendant either had actual knowledge or was willfully blind to facts he should have known. See United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996). "A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." Id. (quoting United States v. Gruenberg, 989 F.2d 971, 974 (8th Cir. 1993)). For a district court to give this instruction, "all that is necessary is evidence from which the jury could infer deliberate avoidance of knowledge." United States v. Whittington, 26 F.3d 456, 463 (4th Cir. 1994).

Here, the Government offered ample evidence from which the jury could infer that Hickson, Smith, and Gunn "deliberately avoided learning of the scheme" that MDH was running. See United States v. Mancuso, 42 F.3d 836, 846 (4th Cir. 1994). For example, the Government introduced an email from Richard Lipsman, who represented a company that provided payroll services to MDH, stating that based on the documents he had reviewed, MDH "can easily be characterized as a fraudulent scheme." J.A. 393. Another example is the "Tactical

9

Solution!!!" presentation by Hickson from July 2007 that highlighted the financial problems at MDH, including the lack of revenue and massive debt. J.A. 2996—3010. A third example is the "Metro Dream Home Accounting Overview" that Hickson presented to Williams and Smith in November 2006. J.A. 3026—32. This evidence, as well as the testimony of many witnesses, provided a sufficient basis for a willful blindness instruction. Accordingly, the district court acted within its discretion when it gave this instruction to the jury.

### III.

Next, Hickson raises two related challenges regarding his counsel. First, he argues that the district court abused its discretion by denying his motion for a continuance. Second, he argues that the district court deprived him of his Sixth Amendment right to counsel and then abused its discretion by allowing him to proceed pro se. We disagree with both arguments.

### A.

We review the denial of a motion to continue trial for abuse of discretion. United States v. Williams, 445 F.3d 724, 739 (4th Cir. 2006). Although the Sixth Amendment guarantees every criminal defendant right to counsel, it does not guarantee a defendant court-appointed counsel of his choice. United

10

States v. Gonzalez-Lopez, 548 U.S. 140, 151 (2006). Rather, the Amendment guarantees that he will have counsel who can provide assistance for his defense at trial. United States v. Smith, 640 F.3d 580, 588-89 (4th Cir. 2011) (citing Gonzalez-Lopez, 548 U.S. at 153 (Alito, J., dissenting)). In reviewing the denial of a substitution-of-counsel claim, we focus on three inquiries: "(1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." Smith, 640 F.3d at 588 (internal quotation mark omitted). This third inquiry focuses not on whether the lawyer and defendant speak at all, but rather on whether their relationship is so broken "that the principal purpose of the appointment—the mounting of an adequate defense incident to a fair trial—has been frustrated." Id. When the relationship reaches that point, the defendant is effectively denied his Sixth Amendment right to counsel and the district court should grant the motion for substitute counsel. Id.

Here, the district court did not abuse its discretion in denying Hickson's motion. First, Hickson's motion was untimely. He tries to cast the motion as timely because he claims that he raised the issue as soon as he became aware of it. Before the district court, however, Hickson admitted that for a two-month

11

period before trial he had no contact with Martin. J.A. 844. Thus, when Hickson waited until a week into trial to make his motion, it was untimely because he raised his concerns about Martin long after they first arose. That Hickson offered a justification for his delay—that is, that Hickson thought Martin had provided assurance that he would be ready for trial—does not change the timeliness of the motion, and the district court did not have to accept this justification for the delay. Additionally, in considering Hickson's motion, the district court was "entitled to take into account the countervailing public interest in proceeding on schedule." United States v. West, 877 F.2d 281, 286 (4th Cir. 1989); see also United States v. Mullen, 32 F.3d 891, 895–96 (4th Cir. 1994). Given the delay that granting a continuance would have caused and the fact that the district court was "skeptical that [Hickson's motion was not] anything other than a strategy move" to delay the trial, J.A. 907, the district court was within its discretion in considering the motion to be untimely.

Additionally, the district court's inquiry was adequate. Hickson argues that the inquiry was inadequate because the district court appeared to focus on the sufficiency of Martin's performance as counsel under the framework of Strickland v. Washington, 466 U.S. 668 (1984). This argument misses the mark. Although the district court did comment on the sufficiency of

12

Martin's performance,[7] the district court's inquiry ultimately went to the relationship between Hickson and Martin, as evidenced by the district court's questions and comments that focused on the status of their attorney-client relationship. See, e.g., J.A. 850, 907–08.

Finally, the relationship between Hickson and Martin was not so broken as to require the district court to have granted substitute counsel to preserve Hickson's Sixth Amendment right to counsel. Hickson points to his statements and a statement from Martin that their relationship was severely strained. J.A. 864–65, 906–07. But the relationship was not nearly so fractured as Hickson claims, as evidenced by the fact that Hickson wanted Martin to be his stand-by counsel after Hickson chose to represent himself and the fact that when Martin was out sick, Hickson wanted to delay the trial until Martin was back instead of having another stand-by counsel. J.A. 1007, 1955. These facts belie Hickson's characterization of the relationship as so broken that Hickson could not have an adequate defense through Martin. Thus, this was not a case in which the district court had "a myopic insistence upon expeditiousness in the face

---

[7] Hickson also fails to admit that much of his argument in the district court on this issue focused on Martin's alleged unpreparedness for trial. That the district court would also thus focus on Martin's performance is understandable. See, e.g., J.A. 857–61.

13

of a justifiable request for delay [that] render[ed] the right to defend with counsel an empty formality." See Ungar v. Sarafite, 376 U.S. 575, 589 (1964). Rather, the district court was within its discretion to determine that substitute counsel was not warranted because Hickson's relationship with Martin was not so broken as to deny Hickson's right to counsel. See Smith, 640 F.3d at 588.

B.

Whether a defendant waives his right to counsel is reviewed de novo. United States v. Singleton, 107 F.3d 1091, 1097 n.3 (4th Cir. 1997). As noted above, the Sixth Amendment guarantees a criminal defendant the right to counsel. U.S. Const. amend. VI. A waiver of that right must be knowing and voluntary. Singleton, 107 F.3d at 1095. "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Johnson v. Zerbst, 304 U.S. 458, 464 (1938).

We review a district court's decision to allow a defendant to proceed pro se after a trial has started for abuse of discretion. Singleton, 107 F.3d at 1096. When a defendant asserts his right to represent himself after a trial has begun, that right "may be denied, limited, or conditioned." Id.

14

Here, Hickson's waiver was voluntary. The district court undertook a long colloquy with Hickson to inquire whether Hickson was aware of his rights, was familiar with criminal law and courtroom procedure, and understood what he was doing. J.A. 1007–11. At the end of this discussion, Hickson stated, "Nobody's forced me to [waive my right to counsel], Your Honor." J.A. 1011. Under these circumstances, Hickson's waiver was voluntary.

Faced with this admission, Hickson frames the issue as a Hobson's choice. He argues that because he wanted substitute counsel after the relationship with Martin allegedly broke down, and once he was faced with keeping Martin or proceeding with no counsel, he had no meaningful choice. The problem with this argument is that the relationship with Martin was not so irrevocably broken. Thus, Hickson did have a choice, and he made a voluntary choice to waive his right to counsel and represent himself. See Johnson, 304 U.S. at 464; United States v. Gallop, 838 F.2d 105, 109 (4th Cir. 1988) ("Since the trial judge properly exercised his discretion in finding that the defendant did not have justifiable reasons for requesting a further substitution of counsel, [the defendant's] argument that his waiver was not voluntary is without merit.").

Having determined that Hickson's waiver was voluntary, we next turn to the district court's decision to allow Hickson to

15

proceed pro se. The district court engaged in a thorough colloquy with Hickson about his decision, and only after that discussion did the district court allow Hickson to represent himself. The district court therefore acted within its discretion when it allowed Hickson to proceed pro se. See Gallop, 838 F.2d at 109 ("[O]nce the trial court has appropriately determined that a substitution of counsel is not warranted, the court can insist that the defendant choose between continuing representation by his existing counsel and appearing pro se.").

IV.

Finally, Smith and Gunn argue that the district court abused its discretion by denying their motions to sever, for a mistrial, and for a new trial after Hickson began representing himself because of Hickson's theory of the case.[8] We disagree.

We review a district court's decision to deny a motion for a new trial, to sever, and for a mistrial for abuse of

---

[8] Smith and Gunn also argue that they should not have been tried with Hickson because of Hickson's deficient performance representing himself. This argument fails because being tried with a pro se codefendant is not prejudicial per se, Person v. Miller, 854 F.2d 656, 665 (4th Cir. 1988), and our review of the record leads us to agree with the district judge that Hickson's performance was not sufficiently prejudicial to Smith and Gunn as to deny them their right to a fair trial, see J.A. 3546.

16

discretion. United States v. Chong Lam, 677 F.3d 190, 203 (4th Cir. 2012) (new trial); United States v. Dinkins, 691 F.3d 358, 367 (4th Cir. 2012) (severance); United States v. Johnson, 587 F.3d 625, 631 (4th Cir. 2009) (mistrial).

"The Supreme Court has indicated that '[t]here is a preference in the federal system for joint trials of defendants who are indicted together.'" United States v. Najjar, 300 F.3d 466, 473 (4th Cir. 2002) (quoting Zafiro v. United States, 506 U.S. 534, 537 (1993)). This preference exists because "[j]oint trials are more efficient, and 'generally serve the interests of justice by avoiding the . . . inequity of inconsistent verdicts.'" Dinkins, 691 F.3d at 368 (quoting Richardson v. Marsh, 481 U.S. 200, 210 (1987)) (omission in original).

Based on this preference, "when an indictment properly has joined two or more defendants under the provisions of Rule 8(b), severance pursuant to Rule 14 is rarely granted." Id. A case should be severed under Federal Rule of Criminal Procedure 14 only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. For a court to sever a trial, the defendant must "establish that actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." United States v.

17

<u>Reavis</u>, 48 F.3d 763, 767 (4th Cir. 1995) (internal citation, quotation mark, and alteration omitted).

Applying these standards, Hickson's theory of the case did not warrant the district court severing the trials or granting a mistrial or new trial. Generally, "mutually antagonistic defenses are not necessarily prejudicial. Hostility among defendants, and even a defendant's desire to exculpate himself by inculpating others, do not of themselves qualify as sufficient grounds to require separate trials." <u>Dinkins</u>, 691 F.3d at 369 (internal citation omitted). Conflicting defenses warrant separate trials only when there exists "such a stark contrast presented by the defenses" that the jury must necessarily disbelieve one defense if it believes the other. <u>Najjar</u>, 300 F.3d at 474.

In this case, Hickson's defense was not so mutually antagonistic to Smith and Gunn's defense as to require separate trials. Hickson argued that he told people, including Smith and Gunn, that MDH had problems but was repeatedly assured that everything was fine.[9] Smith and Gunn argued that they relied on

---

[9] On this point, Smith and Gunn focus much of their argument on the "Tactical Solution!!!" presentation from November 2006, known as Hickson Exhibit 17 at trial. Their arguments are unpersuasive. Because they did not object to the admission of this evidence at trial, <u>see</u> J.A. 2476, we review for plain error, <u>United States v. Brewer</u>, 1 F.3d 1430, 1434 (4th Cir. 1993). Even assuming error, we refuse to recognize it because
(Continued)

18

Williams's assertions that MDH was fine. That Hickson had some evidence of having raised his concerns does not make the defenses inherently contradictory such that the jury could believe one defense only if it rejected the other. If the jury had wanted, it could have believed that Hickson, Smith, and Gunn all relied on Williams's statements and that Hickson had at some point raised concerns that were then alleviated and that if Smith or Gunn were aware of these concerns, their worries were likewise alleviated. Thus, these defenses were not inherently at odds such that Hickson, Gunn, and Smith could not be tried together. See United States v. Allen, 491 F.3d 178, 190 (4th Cir. 2007) ("Focusing on the efficacy of the defense, however, overlooks the salient fact that both Reinhardt and Allen employed essentially the same defense: that neither were actually engaged in the charged fraudulent scheme and that Washington and others were the true wrongdoers."). The district court therefore did not abuse its discretion in denying the motions to sever, for a mistrial, and for a new trial.

---

had Smith and Gunn objected, Hickson could have testified as to who was present for this meeting and the topic of conversation at the meeting, thereby putting before the jury evidence of the fact that Smith and Gunn had knowledge of the financial condition of MDH.

V.

Based on the foregoing, we affirm the convictions of Hickson, Smith, and Gunn.[10]

<u>AFFIRMED</u>

---

[10] We have examined the remaining issues that Hickson, Smith, and Gunn raise in their brief and find them to be without merit.