52 F.3d 323
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Bin WU, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jing PING LI, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Pinzhe ZHANG, a/k/a Peter Zhang, Defendant-Appellant.
 Nos. 93-5800, 93-5801, 93-5802.
 United States Court of Appeals, Fourth Circuit.
 Argued: November 3, 1994.
Decided: April 11, 1995.
 
 ARGUED: James O. Broccoletti, Zoby & Broccoletti, Norfolk, VA; Barton Neal Daniel, Decker, Carton, Thomas, Weintraub, Coureas & Huffman, Norfolk, VA; Andrew Robert Sebok, Norfolk, VA, for Appellants. James Ashford Metcalfe, Assistant United States Attorney, Norfolk, VA, for Appellee. ON BRIEF: Helen F. Fahay, United States Attorney, George M. Kelley, III, Assistant United States Attorney, Norfolk, VA, for Appellee.
 Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 These appeals involve convictions arising out of a criminal conspiracy between Bin Wu, Jing Ping Li, and Pinzhe (Peter) Zhang, all nationals of the People's Republic of China (the PRC) who were in this country legally. Appellants conspired to, and did, export image intensifier tubes (night vision devices) without the proper export licenses. Although the devices may be purchased legally, shipment outside of the United States without the proper export license, 22 C.F.R. Sec. 127.1(a) (1994), violates the Arms Export Control Act, 22 U.S.C.A. Sec. 2778(b)(2), (c) (West 1990), and the International Traffic in Arms Regulations (ITAR), 22 C.F.R. Secs. 120, 121 (1994). The Appellants do not deny that they obtained the devices, or that the devices were shipped without the proper export licenses, with a final destination of the PRC. However, they invoked a public authority defense under Fed.R.Crim.P. 12.3, contending that they were acting with the permission of the United States Government. After a jury trial, Appellants were convicted of multiple counts of conspiracy to export defense articles, 18 U.S.C. Sec. 371 (1988); violations of the Arms Export Act, 22 U.S.C.A. Sec. 2778; money laundering, 18 U.S.C.A. Secs. 1956(a)(1), 1956(a)(2)(A), 1957 (West Supp.1994); and making false statements, 18 U.S.C. Sec. 1001 (1988). Finding no error, we affirm.
 
 
 2
 * Li, Wu, and Zhang are all nationals of the PRC who entered the United States with lawfully issued visas. Li was admitted on September 7, 1987, as a visiting scholar at Old Dominion University (ODU) in Norfolk, Virginia; later he worked at Eastern Computers, Inc. (ECI) for Dr. Richard Cheng. Wu was admitted to the United States on November 7, 1990, on a visa authorizing him to work at ECI. Wu was married to Jie Ying Wang, who followed him to the United States.[1] Zhang was admitted on August 24, 1991, to study at ODU. All three Appellants were well educated and held high government posts in the PRC before coming to the United States.
 
 
 3
 Before coming to the United States, Wu was recruited by the PRC's Ministry of State Security (MSS) to serve as an agent here, and to obtain technological information. Upon Wu's arrival in the United States, he began working with Li and Dr. Cheng in an import/export business. Wu explained his MSS connection to Li, who introduced Wu to Federal Bureau of Investigation (FBI) Agent Blake Lewis. It was Lewis's job to conduct routine interviews of foreign students in the area. Lewis introduced Wu to another FBI agent who conducted a lengthy interview of Wu in Chinese. The FBI then opened an "asset" file on Wu. Lewis served as Wu's contact, and spoke with Wu more than 200 times between April 1991 and his October 1992 arrest, paying his expenses and $21,500 in stipends for information. Li was also an "asset," and was paid $800.[2] Lewis interviewed Zhang at Wu's suggestion, and Lewis considered Zhang to be an "asset," but Zhang was not paid for information.
 
 
 4
 Appellants set up several corporations to obtain image intensifiers from Varo, Inc., a Texas company that manufactures the devices. Two of the corporations, Pacific Basin Import/Export Co., Inc. (Pacific), and Cimex International, Inc. (Cimex), were owned by Li and Wu. The third corporation, Comtex International, Inc. was owned by Li. Wu was the president of Pacific, and listed as vice president on Pacific's business cards was Wu's MSS handler, Zhao Zi-Heng (a/k/a Shen).
 
 
 5
 Between November 1991 and June 1992, Li was the principal contact with Varo, and used his titles from all three corporations in negotiating several image intensifier purchases. Li withdrew from the conspiracy in June 1992, after a falling out with Wu. After June 1992, Zhang was the principal contact with Varo. Wu also had some contacts with Varo. The Appellants, through Pacific, received wiretransferred funds from Ansyn Company (a Hong Kong-based front for the MSS), purchased the devices, and shipped them to Virginia Beach, Virginia, via UPS and Federal Express. They later shipped the devices to Pacific's office in Norfolk, repackaged the devices, created misleading shipping documents, and sent the packages to Ansyn for further shipment to the PRC.
 
 
 6
 Witnesses from Varo testified that they informed Appellants that the devices could not be shipped outside of the United States without an export license. Further, Lewis testified that he told Wu that he could not export anything illegal, and that he would have to obtain export licenses to ship anything that was restricted; he testified, though, that he did not know about the Arms Export Control Act or the International Traffic in Arms Regulations. The Appellants did not obtain export licenses for the devices and, in any event, shipment to the PRC, or export to any country by foreign nationals, is prohibited.
 
 
 7
 The Appellants contend that Lewis authorized them to send the devices to the PRC, or that he failed to inform them that their actions were illegal despite numerous instances when Lewis was informed of their actions, and knew or should have known of the illegality of those actions, but did nothing.
 
 
 8
 Varo officials eventually became suspicious about the Appellants' repeated orders for image intensifiers, and noticed a PRC address (in addition to the Pacific address) on a Pacific purchase order. Consequently, they reported the orders to the United States Customs Service. After an investigation, Customs Service agents arrested Appellants. The FBI was not notified of the Customs investigation, although, coincidentally, Lewis arrived at Wu's office while Wu was being arrested.
 
 II
 
 9
 The first issue on appeal is whether the district court erred in failing to ask questions submitted to the court by the Appellants prior to trial. Although the district judge asked some of the proposed questions, Appellants contend that the court should have asked whether the jurors would believe a law enforcement officer's testimony over that of an ordinary citizen, and should have inquired more fully about the jurors' biases regarding the PRC, foreign nationals, double agents, and communists.
 
 
 10
 Criminal defendants are entitled to adequate voir dire under the Sixth Amendment. Morgan v. Illinois, 60 U.S.L.W. 4541 (U.S.1992). The standard of review for voir dire claims is abuse of discretion. United States v. Brown, 799 F.2d 134, 135-36 (4th Cir.1986). We find that the district court did not abuse its discretion with regard to the voir dire in this case.
 
 
 11
 Although the court asked counsel, at the close of voir dire, whether there were any other questions she should ask, counsel did not request a question regarding credibility, nor did counsel object to the failure to ask such a question. Because counsel did not ask for the instruction when given the opportunity to do so, and did not object to the lack of an instruction, any error by the court has been waived unless it rises to the level of plain error. United States v. LaRouche, 896 F.2d 815, 829 (4th Cir.), cert. denied, 496 U.S. 927 (1990); King v. Jones, 824 F.2d 324, 326 (4th Cir.1987). Further, as discussed below, although the voir dire conducted by the district court was not as thorough as it might have been, any error the court committed did not affect the fundamental fairness of the trial. See United States v. Olano, 61 U.S.L.W. 4421 (U.S.1993).
 
 
 12
 Failure to question potential jurors about biases toward law enforcement officers is not, standing alone, reversible error. United States v. Muldoon, 931 F.2d 282, 286-87 (4th Cir.1990). However, when a defendant requests such a question and the case turns on the law enforcement official's credibility, the court must make an inquiry as to potential bias toward the official's testimony. United States v. Evans, 917 F.2d 800, 807 (4th Cir.1990).
 
 
 13
 In this case, the public authority defense turned partially on Lewis's credibility--if the jury believed Lewis's testimony that he did not authorize the shipment of the devices to the PRC, conviction was likely. However, the case did not turn completely on the jury's belief of Lewis. Wang, who was not a law enforcement official, testified that the Appellants knew they did not have authorization to export the devices; several other witnesses corroborated her testimony. Thus, while some inquiry into bias was necessary, the case did not turn entirely on Lewis's credibility.
 
 
 14
 The district court did not specifically ask whether the jurors would attribute more credibility to a law enforcement officer than to an ordinary citizen. However, the court asked whether any potential juror, or member of any juror's family, was or had been a law enforcement officer. For those jurors replying affirmatively, the judge asked how the juror or relative was affiliated with law enforcement, and whether that involvement would affect the juror's ability to try the case fairly. Immediately after the jurors had responded to these questions, and before the end of voir dire, the judge stated:
 
 
 15
 Now, if you are selected as a juror in this case, you would be required to put aside any feeling of passion or prejudice and decide this case solely on the evidence introduced during the trial and the legal instructions as given to you by the court. Do any of you feel that you cannot do this?
 
 
 16
 The judge further asked whether there were any questions she had not yet asked that were important. At the request of Andrew Sebok, Zhang's counsel, she asked whether any of the jurors spoke or understood Chinese, and no juror responded. There was an ex parte, off the record discussion between the court and Sebok, but no objection was lodged on the record. Further, James Broccoletti, Wu's counsel, objected to one of the Government's peremptory strikes. However, there were no other objections to the court's conduct of voir dire.
 
 
 17
 The judge's questions, though not as specific as those proposed by Appellants, served to inform the jurors that they could not assign more credibility to any particular witness due to a bias, and to screen out any juror who might be biased due to a connection with law enforcement. Further, the case did not turn solely on the credibility of a law enforcement officer; although Lewis's testimony was crucial, Appellants' convictions also are supported by the testimony of Wang and several Varo employees, as well as Appellants' admission that the devices were shipped without the proper licenses. In addition, the voir dire was, in other respects, thorough. See Evans, 900 F.2d at 807.
 
 
 18
 Appellants contend in a cursory fashion that the court failed to adequately question the jurors about their opinions of "the PRC, Communism, credibility of double agents, etc." The only specific question the court asked in this regard was whether any of the jurors spoke, read, or had any working knowledge of the Chinese language. The court instructed the jurors, both at the beginning and the end of voir dire, that they could not be influenced by any bias, prejudice, or passion. Again, although the court asked whether counsel wanted her to ask any other questions, counsel did not ask for any of the questions they now claim should have been asked.
 
 
 19
 Questions regarding racial bias need not be asked if the case has no racial overtones. Rosales-Lopez v. United States, 451 U.S. 182 (1981). Here, while it may have been wise to ask questions about bias, see Ristaino v. Ross, 424 U.S. 589, 597 n. 9 (1976), the failure to do so did not rise to the level of plain error.
 
 III
 
 20
 All three Appellants notified the Government, between November 20, 1992, and January 4, 1993, of their intent to assert a public authority defense in accord with Fed.R.Crim.P. 12.3. Although the Government opposed the defense, it did not file objections to the defense until May 17, 1993, well beyond the time for filing under Fed.R.Crim.P. 12.3(a)(1). Appellants moved to foreclose the Government from contesting the defense because of the Government's untimely objections. On May 19, 1993, the first day of trial, the court held a hearing on this issue, at which the Government attorney stated only that he did not file a timely response because he overlooked the requirement. Apparently, he believed a response might not be required depending on the outcome of the pending Classified Procedures Information Act (CIPA)[3] hearing. The court found, at the conclusion of the Rule 12.3 hearing, that the Appellants were not surprised by the Government's opposition to the defense; consequently, the court refused to preclude the Government from opposing the defense or examining witnesses relevant to the defense.
 
 
 21
 As the court stated at the hearing, the rule gives the court a great deal of discretion--if a party does not comply with the terms of the rule, the court may prohibit opposition to the defense, exclude the testimony of any undisclosed witnesses who were to testify regarding the defense, or enter any order it deems just under the circumstances. Fed.R.Crim.P. 12.3. The court's conclusion that the Appellants were not surprised by the Government's opposition is completely supported by the record--throughout the case, it was clear that the Government did not accept Appellants' position that they had authorization to export the image intensifiers. The court stated:
 
 
 22
 Number one, there is absolutely no prejudice to the defendants. Everyone, including the court, has known all along that the defendants have the public authority defense and that the United States denies that they were acting under any public authority.... If there is any surprise here, the defense counsel can so apprise the court, and I will give the requisite continuance to allow you to prepare for any surprise witness in this regard or any surprise document in this regard, and having heard no such thing from the defense counsel, and no request for any continuance, then I'm not going to grant one.
 
 
 23
 The defense learned during voir dire what witnesses the Government would call; they included Wu's wife, Jie Ying Wang, and Clyde Bryant, Chief of the Compliance Enforcement Branch in the Department of State Office of Defense Controls. On appeal, Appellants assert that the district court abused its discretion in allowing Wang and Bryant to testify because they were not identified in advance as rebuttal witnesses under Rule 12.3. They claim that the Government unfairly surprised them by offering rebuttal to their public authority defense in its case-in-chief. They argue in particular that they were unable to prepare an effective cross-examination of Wang. However, Appellants failed to request a continuance for this reason.
 
 
 24
 Consequently, we find that, although the Government's lack of diligence was regrettable, the court did not abuse its discretion in refusing to strike the Government's opposition to the defense or to prohibit its examination of witnesses on this issue. See United States v. Seeright, 978 F.2d 842, 848 (4th Cir.1992).
 
 IV
 
 25
 Appellants raise two issues concerning admission of evidence, namely a passport and three classified documents. We find that they are not entitled to relief on either claim.
 
 
 26
 During the search of Li's residence, Government agents found two passports bearing Li's name, made out in the same handwriting, and issued on the same date. One contained a photograph of Li and had a Soviet visa; the other had no photograph and a Canadian visa. Li objected to the admission of the photoless passport. After hearing argument on Li's objection, the court admitted both passports. Appellants contend that the admission of the photoless passport violated Fed.R.Evid. 404 because it was evidence of a prior bad act. Evidence is admissible under Rule 404 if it is relevant to an issue other than character, furnishes part of the context of the crime, and is reliable. United States v. Rawle, 845 F.2d 1244, 1247 & n. 4 (4th Cir.1988). We review the court's evidentiary ruling for clear abuse of discretion. United States v. Russell, 971 F.2d 1098, 1104 (4th Cir.1992), cert. denied, 61 U.S.L.W. 3479 (U.S.1993).
 
 
 27
 The photoless passport with the Canadian visa was relevant and arguably furnished part of the context of the crime in that, as an officer of the United States Customs Service testified, illegal exports often are routed through Canada. It also could be altered easily by the addition of a photograph, and therefore aided in proving Li's ability to move about without hindrance and to carry on export and monetary transactions outside the scrutiny of Customs officials. In addition, Appellants did not question the authenticity of the second passport, so reliability was not an issue. Consequently, we conclude that the district court did not clearly abuse its discretion in admitting the passport.
 
 
 28
 Appellants next argue that three classified documents were excluded erroneously by the district court after the CIPA hearing. The first document, CD1, was a December 1992 intelligence report stating that Appellants' companies had illegally exported image intensifier tubes to the PRC and that Appellants had been arrested and were awaiting trial. The FBI was neither the issuer nor the recipient of this report. The second document, CD2, was a message from an intelligence agency to various intelligence agencies and offices stating that a source had reported that a PRC agency had acquired restricted image intensifier tubes as of August 1992. Appellants are not mentioned in this document. Finally, CD3 was an intelligence message reporting that the People's Liberation Army (PLA) had directed front companies in Hong Kong to buy United Kingdom image intensifier tubes, but to conceal PLA involvement. Appellants are not mentioned in this document and the FBI neither issued nor received it.
 
 
 29
 The judge ruled that all three documents were inadmissible because they were not relevant. On appeal, Appellants claim that the documents were admissible to impeach Lewis because they showed that the entire American intelligence community knew that China was attempting to acquire image intensifier tubes and that Lewis knew it was illegal to export them.
 
 
 30
 A district court's exclusion of classified material is reviewed for abuse of discretion. United States v. Fernandez, 913 F.2d 148, 155 (4th Cir.1990). Classified materials may be excluded from evidence after a CIPA hearing if the possible prejudice from their disclosure outweighs their probative value. Fed.R.Evid. 403; United States v. Anderson, 872 F.2d 1508, 1514-15 (11th Cir.), cert. denied, 493 U.S. 1004 (1989). The defendant bears the burden of showing that CIPA material should be admitted. United States v. Miller, 874 F.2d 1255, 1277 (9th Cir .1989). Further, the defendant must show by more than mere speculation or conjecture that the documents are relevant; the classified material must be essential to the defense, and may not be merely cumulative or corroborative. United States v. Smith, 780 F.2d 1102, 1108, 1110 (4th Cir.1985).
 
 
 31
 Although these documents certainly could have been admitted, we find that the district court did not exceed its discretion by excluding them. CD1 and CD2 were created after Appellants' arrests; consequently, they do not show that the FBI in general, or Lewis in particular, knew before the arrests that these individuals were illegally exporting image intensifier tubes. CD2 does not mention Appellants' names or the names of their companies, so it could be referring to anyone in the United States illegally exporting image intensifier tubes. CD3 shows that some agency knew that China was trying to acquire image intensifier tubes before Appellants were arrested. However, it does not mention the FBI, Lewis, or the Appellants. Thus, none of the documents show anything tending to make it more or less likely that the FBI knew before Appellants' arrests that China was trying to acquire image intensifier tubes, or that Lewis was lying when he professed ignorance about the export restrictions. The exclusion of these documents was proper.
 
 V
 
 32
 Appellants also contend that they were entitled to an FBI manual, and testing of several FBI-produced documents, primarily for the purpose of impeaching Lewis. Appellants contend that many documents, including some of Lewis's records of his contacts with Wu, were missing from the materials disclosed to them before trial. Lewis testified that he did not keep detailed records of every conversation he had with Wu, but rather destroyed notes that did not contain any significant information. He testified that he turned over all notes he had kept. Appellants argued that undisclosed documents existed; however, they failed to specify what documents were missing, contending only that there must be more documents in the file. Therefore, Appellants sought access to the current FBI procedure manual in order to discover what procedures the FBI dictated for recording contacts with assets, maintaining records of such contacts, and destroying notes memorializing contacts.
 
 
 33
 To the extent that Appellants claim that they could have used the FBI manual to impeach Lewis's testimony about his note keeping practices, they arguably stated a Brady claim. Suppression by the prosecution of material evidence favorable to the accused violates due process. Brady v. Maryland, 373 U.S. 83, 87 (1963). It is the charac ter of the suppressed evidence, rather than the character of the prosecution, that is determinative. United States v. Agurs, 427 U.S. 97, 104 (1976). Thus, even if the government acts in bad faith, the outcome of the trial is questionable only if the suppressed evidence was material. Evidence is material if there is a reasonable probability that its disclosure to the defense would have changed the outcome of the trial. United States v. Bagley, 473 U.S. 667, 682 (1985).
 
 
 34
 We find that the FBI manual was not material. Appellants were able to, and did, argue to the jury that Lewis could not be believed when he said he did not keep notes of all of his meetings. They made no showing that they could have impeached Lewis more effectively with the FBI training manual; at most, they could have argued that Lewis did not follow the practices dictated by the manual, an argument not substantially different than that they were able to make. Moreover, by their own admission, Appellants could have acquired the same information they sought from the training manual from other sources. Because Appellants have not shown that the FBI manual could have affected the outcome of the case, this claim lacks merit. Bagley, 473 U.S. at 667.
 
 
 35
 After the close of evidence, Appellants brought to the court's attention for the first time that four FBI 209 forms[4] produced by the Government were altered in that the dates on the forms had been changed. After a hearing on this matter, the court ruled that because the altered documents already were part of the record, Appellants could discuss the alterations during closing argument. However, the court refused to reopen the case for further evidence, concluding that because Appellants knew about the alterations before the evidence closed, they should have pursued the matter earlier. Appellants informed the court that their strategy was to wait until closing argument to point out the alterations to the jury.[5]
 
 
 36
 Although Appellants listed it as an issue in their brief, nowhere do they argue that the district court abused its discretion by refusing to order the ink on the altered 209 forms to be tested to determine when the changes were made. "[F]ailure to argue an issue posed for consideration is deemed an abandonment of that issue." Bender v. Brumley, 1 F.3d 271, 275 (5th Cir.1993). We therefore do not address this claim.
 
 
 37
 To the extent that Appellants argue that the Government intentionally withheld the altered 209 forms, thereby denying them of due process, the argument is meritless. Suppression of exculpatory evidence violates due process when there is a reasonable probability that but for the withholding of the evidence, the result of the proceeding would have been different. Bagley, 473 U.S. at 682.
 
 
 38
 Here, there is no showing that the evidence Appellants assert the Government withheld was material. Similarly, Appellants make no showing of how any testing of the ink on the alterations could have affected the outcome of the trial, particularly in light of the fact that no one disputed that the documents in fact had been altered. Finally, Appellants discovered the alterations before the close of evidence, but chose to wait until after the close of evidence to inform the court; nevertheless, the trial judge allowed Appellants to discuss the altered documents during closing arguments and thereby bring the changes to the jury's attention. In these circumstances, Appellants' claim does not warrant reversal.
 
 VI
 
 39
 Although Appellants do not specifically argue that the evidence was insufficient to convict them, they claim repeatedly that Lewis's testimony, which refuted their defense that they acted under public authority, was inherently incredible. They assert that the Government obtained their convictions through deception which they were unable to expose because the district court "naively" trusted the Government, refusing to allow discovery of exculpatory material withheld by the Government, denying their request for the FBI manual, and declining to order the testing of the inks on the altered 209 forms. We find that the Government's evidence on the whole corroborated Lewis's testimony, and was more than sufficient to support the verdict.
 
 
 40
 The standard of review for a sufficiency claim is whether, viewing the evidence in the light most favorable to the government, any ratio nal trier of fact could have found the defendants guilty beyond a reasonable doubt. Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982). Most importantly, the jury found Lewis a credible witness, a decision which is not susceptible to review. Saunders, 886 F.2d at 56. Lewis testified that he had no expertise in the exportation of sensitive materials, but that he warned Wu not to export anything illegal, and told Wu that he would need an export license for any items subject to export restrictions. He said that he would never assist an asset in obtaining an export license which the asset could not otherwise obtain, because such assistance would endanger the asset by arousing suspicion among his handlers in the PRC.
 
 
 41
 There was additional evidence that the Appellants knew the export of night vision devices was illegal. Wu informed his contact in Hong Kong that he did not have the necessary end user certificate for the devices and that, consequently, a letter of credit could not be used. Wang testified that Wu did not tell Lewis (known to her as Mr. Brown) that he was exporting the devices without a license, and that he was worried that Lewis would discover what he was doing. She also testified that Wu and Li discussed their inability to obtain an export license for the devices, and the possibility of sending them via United Parcel Service to avoid Customs scrutiny and the licensing requirement.
 
 
 42
 When Li initially contacted Varo in connection with the purchase of the devices, he was informed that it was illegal to export them without proper licensing. Also, a former business partner of Li's testified that he had previously looked into the possibility of exporting the night vision devices, and told Li it could not be done without a license.
 
 
 43
 Finally, when Zhang was arrested and informed of the charge against him, Zhang said, "It's not my fault. I knew it, I knew it." Zhang said he knew a license was necessary for the exports, and suspected that it had not been obtained. However, he continued working with Wu. Viewed in the light most favorable to the Government, this evidence was sufficient for a reasonable jury to find that the Appellants knowingly exported the devices without the proper licensing and without other public authority.
 
 VII
 
 44
 Pursuant to United States Sentencing Commission, Guidelines Manual, Sec. 3B1.1(b) (Nov.1992), the district court enhanced Li's offense level by three levels for his aggravating role as a supervisor or manager of the criminal activity. Li contends that this enhancement was erroneous.
 
 
 45
 Section 3B1.1(b) provides for a three-offense-level sentence enhancement when (1) the defendant was a manager or supervisor in the offense and (2) the criminal activity involved more than five people or was otherwise extensive. The district court's findings as to a defendant's role in the offense should be upheld unless clearly erroneous, giving due deference to the district court's application of the guidelines to the facts of the case. United States v. Sheffer, 896 F.2d 842, 846 (4th Cir.), cert. denied, 498 U.S. 838 and 498 U.S. 968 (1990); United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989).
 
 
 46
 Under the 1992 guidelines, a defendant's extensive management responsibilities over property or assets of a criminal organization may justify an offense level increase under section 3B1.1(b).[6] United States v. Chambers, 985 F.2d 1263, 1267 (4th Cir.), cert. denied, 62 U.S.L.W. 3246 (U.S.1993). Li was involved extensively as a director, officer, and/or shareholder of the three companies through which Appellants purchased image intensifier tubes. Li initiated the purchases and signed the purchase orders for many of the tubes. It was Li who introduced Wu to the freight forward and customshouse broker who Wu used to export the equipment. The Government also presented testimony about Li's extensive involvement in Appellants' export activities.
 
 
 47
 In light of the evidence that Li was involved in the management of the companies through which the image intensifier tubes were ordered, that he personally ordered many of the tubes and introduced Wu to the broker who would export the equipment, and that the conspiracy involved more than five people, we find that the district court did not clearly err by enhancing Li's sentence under section 3B1.1(b).
 
 VIII
 
 48
 Wu, Li, and Zhang have each submitted pro se supplemental briefs raising a number of additional issues. We have reviewed each brief carefully and find that Appellants have not identified any reversible errors. Briefly summarized, Wu attacks the credibility of various witnesses and the accuracy of the translations of Chinese documents which were introduced, all of which were matters for the jury to consider. He also claims that the jury should have been sequestered, but does not state how he was prejudiced by the failure to sequester. All but plain error review of this claim has been forfeited, in any case, because sequestration was not requested. Fed.R.Crim.P. 52; United States v. Olano, 61 U.S.L.W. 4421 (U.S.1993). We do not find plain error in the failure to sequester.
 
 
 49
 Li and Zhang assert that the district court erred in instructing the jury that the intent element of the offense was "willingly" rather than "willfully" exporting restricted items without a license. The appearance of the term "willingly" in the transcript was apparently an error on the part of the court reporter.[7] However, even assuming that the court used the wrong term, it later instructed the jury on the meaning of the term "willfully," ensuring that the jury had a correct understanding of the intent required for conviction. Thus, there is no basis for a finding that the jury was confused about the element of intent. United States v. Iredia, 866 F.2d 114, 118 (5th Cir.), cert. denied, 492 U.S. 921 (1989).
 
 
 50
 Zhang and Li also assert that the district court failed to give a specific intent instruction on the conspiracy count. The court's instruction was adequate, however, because it stated that the jury was required to find that each defendant knew the purpose of the conspiracy and deliberately joined it. A definition of "deliberately" was not required. They claim that the prosecutor characterized them as spies in his closing argument, thus depriving them of a fair trial. Even if the prosecutor's comments were improper, which is debatable, they did not amount to reversible error under the test set out in United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir.1983), cert. denied, 466 U.S. 972 (1984).
 
 
 51
 Zhang contends that the warrantless search of his home violated the Fourth Amendment. It is not clear from the materials before us whether Zhang attempted to suppress evidence taken from his home at alleged suppression hearing in April 1993, but Customs agents testified that he consented to a search of his apartment. Zhang also complains that he was inadequately informed of his Miranda[8] rights, but has forfeited all but plain error review of the matter by failing to raise it at trial. We find no plain error in the admission of statements made by Zhang at his arrest because the Customs agent who arrested him testified that Zhang was properly informed of his Miranda rights. Zhang further asserts that the district court erred in failing to depart downward when sentencing him; however, a failure to depart is not appealable. United States v. Bayerle, 898 F.2d 28 (4th Cir.), cert. denied, 489 U.S. 819 (1990). He also claims that his assets were seized improperly, and that he received ineffective assistance of counsel. These claims are better raised in a 28 U.S.C. Sec. 2255 (1988) motion. See United States v. DeFusco, 949 F.2d 114 (4th Cir.1991), cert. denied, 60 U.S.L.W. 3717 (U.S.1992).
 
 IX
 
 52
 We deny Appellants' motion for the testing of certain FBI documents. Appellants' convictions and sentences are affirmed in their entirety.
 
 AFFIRMED
 
 
 [1]
 Wang pled guilty to criminal contempt; the charge involved her attempt to take the proceeds of the image intensifier sales out of the country, contrary to a court order freezing the funds
 
 
 [2]
 Only Wu admitted to being an MSS agent
 
 
 [3]
 18 U.S.C.App. III (1988)
 
 
 [4]
 A "209" is a form used by the FBI to report contacts with assets
 
 
 [5]
 Lewis testified during the hearing that the altered dates appeared to be corrections of errors made by him or FBI clerical staff
 
 
 [6]
 The commentary to section 3B1.1 has since been amended to require that a defendant must have been the organizer, leader, manager, or supervisor of at least one other participant in order to receive an adjustment under this section. USSG Sec. 3B1.1, comment. (n.2) (Nov.1993)
 
 
 [7]
 The Government contacted the court reporter after preparation of the transcript and questioned whether the district court had said "willingly." The reporter consulted her notes, found that she had made an error in the transcription, and corrected the transcript, substituting "willfully" for "willingly."
 
 
 [8]
 Miranda v. Arizona, 384 U.S. 436 (1966)